(No. 4623)

JOHN D. LONG, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed July 24, 1959.*
*Petition of claimant for rehearing denied October 2, 1959.*

JOHN R. SNIVELY, Attorney for Claimant.

LATHAM CASTLE, Attorney General; MARION G. TIERNAN, Assistant Attorney General, for Respondent.

WHAM, J.

In this case, claimant, a prisoner at the Illinois State Penitentiary, was injured on May 19, 1952, while per-

forming his duties as a teamster. He claims damages in the amount of $100,000.00, and charges in his complaint, as amended, that respondent was negligent in the following respects:

"(a) Failed to make, promulgate and publish rules and regulations for the safety of claimant.

(b) Failed to provide reasonably safe methods of work.

(c) Failed to furnish claimant with reasonably safe tools, machinery, appliances and instrumentalities, and places to work.

(d) Ordered claimant to labor under unsafe conditions.

(e) Failed to instruct claimant in such labor, and to warn him of the dangers thereof.

(f) Failed to provide adequate or proper safeguards.

(g) Ordered claimant to labor without adequate or proper safeguards.

(h) Failed to furnish claimant with adequate help or assistance.

(i) Ordered claimant to labor without adequate help or assistance.

(j) Failed to warn claimant of the frisky, skittish disposition of the mules.

(k) Failed to tie up the cows or to turn them out to pasture while claimant cleaned the manure out of the cow shed."

He also charges in his complaint that respondent violated the law of Illinois in requiring him to perform labor outside the walls of the penitentiary, and should, therefore, respond in damages for his injury.

The only eyewitness to the occurrence in this case was claimant. The evidence set forth in the statement of facts in claimant's brief is as follows:

"John D. Long was a prisoner in the Illinois State Penitentiary. (Abst. 2.) He was indicted on January 13, 1944 in the Circuit Court of Winnebago County for the crime of robbery. He entered a plea of guilty on January 17, 1944, and was sentenced to a term of not less than 5 years nor more than 15 years. He was received at the Diagnostic Depot at Joliet, Illinois on February 15, 1944. He was classified for work by the Classification Board.

He was transferred to the Stateville Branch. His first assignment was on the coal pile, where he remained for about 3 years. (Abst. 3.)

He was then transferred to the Menard Branch on August 7, 1947. His first assignment was to the rock quarry, where he remained for about three years. He was next assigned to the Honor Farm on July 7, 1950. He did not make application for the work, but he signed an honor pledge. (Abst. 14.) In obedience to the orders and assignment, he entered upon the performance of the labor on the farm, which was located about 3 miles outside

the walls of the penitentiary. His first assignment was gardening, which he continued for a couple months. He was next assigned as a teamster. He was required to haul various things.

He reported for work on May 19, 1952. Roy Harris, the Superintendent, ordered him to clean the manure out of the cow shed. (Abst. 3.) He first hitched his team to a wagon, which he had used for a couple of weeks, while his wagon was being repaired. He had driven one mule for about a year, but not while any cows were in the shed. It was the first time he had used the other mule. (Abst. 18.) Nothing had been said to him about the disposition of the mules. (Abst. 13.) In addition, he had not had any trouble having them scare or run off, nor had he seen any one else have any trouble with them. (Abst. 18.)

The cow shed was a temporary building, which he had helped to build two or three months before that. It was constructed from the roof of an old garage, which had been cut into sections. They were placed on the top of posts. (Abst. 4.) The shed was approximately 45 feet in length, and a length and a half of a wagon in width. The front was open, but the ends and back were boxed in. There were no doors or partitions. The roof slanted toward the back. You could touch it with your hands at the back. (Abst. 15.) The shed was used by the cows with calves at night. (Abst. 16.)

When he arrived there, he opened the gate and drove into the yard. The cows, which were in the shed, were supposed to have been in the pasture. They were not tied up, but were loose in the shed.

He then backed the wagon into the shed. The mules and the front part of the wagon were clear of it. He next got down from the wagon. He started to load it with manure. It took him about 15, 20 minutes. The Superintendent was not there, nor was any officer or guard. (Abst. 4.) No one had shown him anything about the work, or helped him. He loaded his own wagon. When he finished, he climbed back on the seat. He discovered the cows coming out of the shed. They had come from the other end, and were right in front of him. The mules became frightened. They backed up in the shed instead of going forward. He bent over, but his back scraped against the roof. He kept yelling at the mules to go forward. They made a lunge, and started to run away. He had the lines, and raised up a little. As he did so, his shoulders struck a rafter. That is when he actually felt the pain. (Abst. 18.) He tried to stop the mules, but he was not able to do so. (Abst. 13.) He fell or was pulled down. When the wagon stopped, his hands were on the double tree, and his feet were up on the wagon. (Abst. 5.) He was not able to move. He sustained severe injuries.

He was taken to the hospital, where he was placed in traction. (Abst. 6.) He remained there 19 days, and was transferred to the Stateville Branch on June 6, 1952, where Dr. J. P. Cascino of Chicago, a neurosurgeon, examined him. X-rays revealed a dislocation of the first lumbar vertebra. Dr. Cascino performed a laminectomy on June 8, 1952.

He was discharged from the penitentiary on December 12, 1952.

(Abst. 6.) He was taken to the Dixon State Hospital, where he remained until 1954. He then came to Rockford.

He first used a wheel chair, but now uses crutches. He is paralyzed in both legs. His injuries are permanent. (Abst. 9.) He is not able to walk or work.

He was 38 years of age at the time that he was injured. (Abst. 2.) Prior to his imprisonment, he had earned $150.00 a week in the trucking business, and $75.00 a week in the foundry. His life expectancy, as shown by Dr. Wigglesworth's Tables, is 26.91 years. (Abst. 20.)"

Respondent agrees with this statement of facts in its brief with the exception that it sets forth additional facts appearing from the transcript, which are as follows:

"That claimant was acquainted with the habits and traits of mules since childhood (Tr. p. 78); that claimant had worked as a teamster in the penitentiary for approximately two years (Tr. p. 82), and had hauled manure from the same shed on numerous occasions (Tr. p. 102). . . . That all the crops grown on the prison farm were used for consumption within the prison (Tr. p. 81). That the manure hauled by claimant was used as fertilizer on the prison farm and in the flower gardens within the prison (Tr. p. 81)."

After examining the record in this case, and considering the briefs and arguments of the respective parties, we conclude that claimant has failed to establish any act of negligence on the part of respondent, which proximately caused the injuries in question.

The mere fact that claimant was working on the Honor Farm outside the walls of the penitentiary does not justify an award.

It is fundamental that the State is not an insurer of an inmate's safety. Claimant must bear the burden of proving that his injury was proximately caused by a negligent act or omission on the part of respondent. This he has failed to do.

Claimant was as familiar with the conditions existing prior to and at the time of his injury as was respondent, if not more so. The proximate cause of his injury was the fact that the mules backed up rather than pro-

ceeded ahead. At this time they were under his sole control.

There is no evidence in the record, which establishes these mules to be different than any other mules. Respondent cannot be held to guarantee that a team of mules will respond to the wishes of the driver as would a motor driven vehicle.

Claimant was no novice at handling mules, and respondent was under no duty to either instruct or warn him regarding their propensity, or furnish him with an assistant to handle the mules.

Claimant contends that the cows frightened the mules, and that respondent should have either tied them up or turned them out to pasture in preparing the way for claimant to do his work.

This position is not well taken. The record reflects no evidence that respondent had knowledge of this fact. Moreover, if the presence of these cows was so significant, then certainly claimant had more of an opportunity to take remedial action himself than did respondent. He could have driven the cows out of the cow shed and into the pasture himself, or notified an agent of respondent.

Claimant also contends that the cow shed was not of sufficient height for the proper handling of the team and wagon when in the shed. There is no doubt but what the roof was too low for claimant to seat himself in the driver's position in the wagon, if the mules backed into the shed. This fact must have been as obvious to claimant as to respondent. No one ordered him to sit on the seat while driving the mules out of the shed, nor was it necessary for him to board the wagon until it was clear of the shed.

Respondent was under no duty to provide him with a certain height cow shed to clean out. This shed simply

presented an ordinary condition, which was to be reckoned with and considered by claimant in performing his duties. It was no more dangerous than any other space occupying object, and required no more skill or judgment with respect to solving any problems it created than any other object confronting man, as he daily moves throughout the world.

To hold that respondent was negligent in directing claimant to clean out this low roofed cow shed, in that it should have foreseen the resulting injury, would, in our judgment, place upon respondent the duty to insure the safety of all inmates under its jurisdiction, not only with respect to the actions and conditions of respondent's agents and chattels, but also with respect to the actions and judgments of the inmates themselves. Such, of course, is not the law.

The injury was most severe and unfortunate, but in view of the evidence we must deny this claim.